Case for argument on today's calendar is Alaska Right to Life Committee versus Jeffrey Feldman. I would ask for indulgence in allowing me to use a visual aid. That's fine. She wants to use a visual aid. That's fine. Okay, thank you. That's fine right there. Yeah. Good morning, Your Honors. My name is Jan DeYoung, and I'm the Alaska Assistant Attorney General representing the members of the Judicial Conduct Commission in this case. The commission in this appeal seeks the reversal of a district court decision. Alaska Right to Life obtained a decision below using the First Amendment that has the effect of giving Alaska state court judges the right to make a promise to a voter of special interest group about conduct on the bench during a retention vote. A reversal is very important, and the reason is that a state judiciary that is free from such election-made promises is needed for a judicial system that is both impartial and equally important appears to be impartial. The state has a compelling interest in ensuring that people who go to court have their cases decided on the law and not on the basis of any explicit or even implied promise to the voters. This right, which is grounded in the Due Process Clause, should be obvious. Now, the focus of my remarks today is on the constitutionality of two clauses in Canon 5A3D. There are other issues, and I'd be happy to answer questions on those points, but I want to be talking about the constitutionality. Would it be helpful to me just – you're not – you had a pretty strong argument about just the stability here, standing and rightness and other – We have a very strong argument on constitutional standing under Article 3, Your Honor. I mean, this case was filed in – And we need to decide that. I mean, you've raised the issue, so we need to decide it, correct? Yes, absolutely, because in order to consider the constitutional issue, you need to establish that you have standing under Article 3 and that the case is right. Oh. Also, there's prudential rightness. There's prudential rightness, and we've also raised a question of whether the court should be abstaining under the Pullman Doctrine or whether it should be certifying a question to the Alaska Supreme Court. All of these questions are important, but I was hoping to focus my remarks today on the constitutional First Amendment issue. That's fine. We'll let your adversary talk about that one. If you want me to just recap the stand – No, that's okay. Let's just – go ahead. Thank you, Your Honor. Republican Party of Minnesota v. White. It's a 2002 United States Supreme Court which addressed a judicial canon in the context of the speech of judicial candidates. And the canon in that case prohibited announcements on legal views. Now, the court found in its plurality decision that the canon was not sufficiently narrowed to the compelling goal of impartiality towards litigants. Now, since that decision was decided, Right to Life and similar organizations have relied upon that case to invalidate judicial canons throughout the country, limiting the speech of judges for judicial office. But this case and the Alaska canons before the court today are very different and require a different result. The first difference that I want to talk about is the language of the Alaska canon. And I have the language there on the board. It's important that we be looking at this language as a Right to Life. It's incorrectly quoted in the canon throughout this litigation. Now, the Pledges and Promises and Commits Clause are very different than the Announce Clause that was considered in the White decision. I mean, first, the Pledges and Promises is for the – of conduct in judicial office. Alaska added the word judicial. Other than to faithfully and impartially perform the duties of the office. Well, doesn't that – if you just take that clause, doesn't that further the same interest identified by the Supreme Court in White of impartiality? Yes, it does. But it also – I mean, there are three kinds of impartiality that the court identified there. One was impartiality as to the actual litigants in a case. One had to do with this – showing a predisposition on a legal issue. And finally, sort of the notion that a judge is open-minded and will decide the case on the facts and the law that comes before them. And the court in that case discredited the Announce Clause, which it said was really trying to promote this notion that a judge can't disclose a predisposition by discussing on the legal view. And so it invalidated that goal and said that that wasn't narrowly – that didn't promote impartiality. Judges have – you know, they issue decisions. They speak publicly. And this predisposition wasn't something that the state could constitutionally prohibit. But it did identify that the interest in impartiality towards litigants and this concept of open-mindedness were compelling interests that were appropriate of protection. In White? Yes. White assumed that. White assumed that. Yeah. It didn't get to it. It didn't need to because it found it was not narrowly tailored. That's right. So the issue you have before you is that that issue hasn't been decided by White. Let's assume for the purpose of my question the same assumption, that there is a compelling interest. In White, it says that the issue, the question of the court is that it doesn't restrict speech because of particular parties but rather because of particular issues. Now, how is this different? Why don't we just apply White? Because in this case, it restricts speech for or against particular parties, particular issues and not particular parties. Well, a pledge or a promise in the context of an election is basically made to a class of voters or a public special interest group such as the Right to Life organization that's before the court today. And so such a promise or pledge establishes an actual commitment to vote in a certain way when the issue comes before the judge. So not only is this, I guess it shows impartiality towards the litigants that would be appearing in that case, but also it detracts from the judge's open-mindedness because there's no judicial independence, Your Honor. I mean, the judge is already committed to the outcome in the case and not to applying the actual facts and the law that would be relevant in the particular case. This goes directly to the impartiality interest that is, you know, basically a state concern because of the guarantees of the Due Process Clause, which require that a fair and impartial hearing be available. I wanted to talk, you know, three points, and one of them was the direct language. Excuse me, I'm not sure I got my answer. Okay. I think the analysis between parties and issues in White seems to be the same as the analysis between parties and issues in the case before us. And I'm just asking, why doesn't White control? White doesn't control because White prohibited an announcement of a legal view. And what is being prohibited here, Your Honor, is an actual pledge or promise of conduct in judicial office. It's directed to a voter and prohibited. Excuse me, I'm missing something. I announce at one time I'm pro-life or I say in a vote I'm pro-life. What is the difference? There's an important difference, Your Honor. If you say something like was suggested in the survey, I believe Roe v. Wade was wrongly decided, that's an announcement of a legal view. There is no commitment in that case, Your Honor, to decide the case outside of the facts and the law and the precedent that would be applicable to the specific facts in that case. So it might show a predisposition or bias, but the Supreme Court in Justice Scalia's decision said you couldn't prohibit that kind of speech. But we're not prohibiting that kind of speech, Your Honor. There is no prohibition against a candid discussion on legal issues simply in that first clause against the making of an actual pledge or promise about conduct in judicial office, which reasonably means a particular vote in a particular case. And you don't need those words for the language conduct in judicial office to be reasonably understood to have that meaning. So I can't say that I promise to send all drunk drivers to one weekend in jail. No, you may not say that, Your Honor. That would be clearly making a commitment. Basically, you would be prejudging credibility in a particular case, the outcome in the case, without any regard for the facts and the legal issues in that specific case. And that kind of speech would be prohibited under the pledges and promises. Now, the Seventh Circuit in Buckley disagreed with your analysis. We have some law in our circuit that we don't create inter-circuit conflicts unless we have a good reason. Would Buckley, if it were, if we had Buckley as a Ninth Circuit case, would that determine this case? No, it would not, Your Honor. How would you distinguish Buckley? I would like to call your attention to the commentary that the Alaska Supreme Court adopted when it adopted the two clauses here. And the Court specifically talks about the Buckley case, and it distinguishes the case. And what the Court did was to adopt a version of the clause that was not considered in the Buckley case. Now, the Alaska Supreme Court, when it adopted the canon, added the word judicial as a qualifier in front of office in the pledges and promises clause. And it also added to the commits clause. And the Buckley case did not consider a commits clause. That was an announce clause. But it adopted the narrower commits clause and added additional narrowing language to a specific view or decision in that, in order to, I guess, in order to make a narrower case for promoting the compelling interest of impartiality. And it actually – Go ahead. Finish up. Make your comment. And the end of this commentary, Your Honor, was a statement that the canon should not be enforced in a way that should interfere with First Amendment rights. So the Alaska Supreme Court was specifically mindful of the Buckley case and trying to work around it and still meet its objective of avoiding the appearance and reality of impartiality. Could I suggest something? I think we're going to have a number of questions about – at least I do. I should only speak for myself – about standing and rightness that I'd like to explore with the other side. And you're down to seven minutes, and you might want to save some time to respond to what she has to say. Okay, Your Honor. And I also have to give Mr. Giudani a couple of minutes on his issues for the Alaska Bar Association. So time is running here. Okay. So let me – a couple of points – another point I want to make. If you look facially at this language, I also want to say that the appears-to-commit language is not overbroad. And the reason for that is the objective is to prevent the appearance and reality of corruption – I mean impartiality, excuse me. And clearly, while an actual pledge or promise or commitment certainly is the greatest risk against impartiality, the appearance of such a promise or commitment is equally troublesome because, Your Honors, the reputation of the courts for nonpartisanship and fairness and impartiality is essential for the courts to function effectively. I also want to point out that the Alaska Supreme Court and the Judicial Conduct Commission has not had an opportunity to apply the clauses in the context of judicial selection or election, and that it is a facial challenge that is being looked at. The director's letter to the Right to Life organization is not fairly construed to be an enforcement action. It doesn't talk about enforcement or sanctions. It's basically cautionary that there could be problems. Specifically, it looks like she's talking about the recusal clause and an obligation to later not hear a case rather than a pre-speech prohibition. And finally, Your Honor, on this constitutional question, the third difference I would like to point out is that Alaska does not select its judges through an election. It is a merit selection process. It doesn't put the judges to the hurly-burly that was the concern in Justice O'Connor's concurring opinion where she was saying by voluntarily taking on an election, a contested popular election, the select judges do necessarily have the fundraising and speeches that could erode the public's confidence in the judicial system. We don't have that here. The only question for the voter is whether to retain this experienced judge. And I guess I will reserve my remaining time. You're down to five minutes. For the standing official questions. Thank you. Okay. May it please the Court. My name is Anita Woodford, Counselor for African-Youth. I'd like to write to Mike and Mike Miller. Before this Court, it is whether the holding of Republican Party, Minnesota v. White, that judicial candidates have a free speech right to announce their views is applicable in all contexts, including questionnaires, like Alaska right to right. The District Court has held that it is, and this Court should affirm that ruling today. So how is there constitutional standing here? Well, as this Court is aware, every plaintiff that comes before it must have standing. And it's a key case that delineates the test for evaluating standing. Standing would be allusion to the defenders of wildlife. The first of the three parts requires injury, in fact. And I do believe that Alaska right to life can demonstrate an injury, in fact. What's the injury? The injury here is judicial candidates have sent questionnaires from Alaska right to life. And because of the canons, they have chosen not to respond. Their speech has been chilled. Well, is chilling enough? Is there any case that says chilling is a sufficient injury? Chilling is somebody else's speech. Well, the Supreme Court in Larrabee-Tatum discussed chilling as an appropriate... But did it involve this kind of situation? Not precisely the same thing. I don't think it did. Chilling is a rather vague expression. Usually injury means something's actually happened to you. So what has happened to right to life? They didn't get an answer to a question that they wanted an answer to. Is that an injury? I believe it is. We really don't know how any of these judges would have answered. I actually would disagree with you on that point, Your Honor. We do have letters from several of the judicial candidates that we have included in the record that indicate that it is because of the canons that they chose not to answer. They don't exactly say that. Well, Judge Penielly, for example, indicates that he has been hesitant to respond only because of the canons and how they will... Did he specifically identify this particular closet issue here? I... It's all vague, isn't it? There's no reference to a specific canon. Aren't you in a position that you have to show a willing speaker before you can have constitutional standing, constitutional ripeness, or even prudential ripeness? So isn't that your burden to show a willing speaker? Yes, Your Honor. And how is it done here? Well, as I've indicated, we do have letters from judges, and perhaps you might refer to them. Judge Penielly's letter is on page 49 of the executive record. And he indicates that he is aware of Republican Party v. White and believes that while out of the position of the Alaska right to life, he said that because of that decision he could announce his views, he said it also is equally arguable that it doesn't apply to the Code, and has spoken with the Commission about the impact of White on Alaska's Code of Judicial Conduct. Now, I do agree that it does not explicitly refer to the Committee's clause or the Pledges of Promises clause, but I don't think it's a stretch to arrive at the conclusion that that is the relationship, because in White we have the Announce clause, which prohibited announcing views on legal and disputed issues, and the Pledges of Promises clause and the Commit clause both deal with very similar-type speech, perhaps in a narrower capacity, but again, I don't think it is unreasonable to make that run like this. Under your ripeness argument, you need a genuine threat of imminent prosecution. Persecution, maybe. Prosecution. And the courts have indicated there has to be a concrete plan. There's got to be a specific warning or threat. There's got to be past prosecution or enforcement, something in that area that's going to show ripeness. I'm having difficulty finding that in this case. Well, Your Honor, this is a pre-enforcement challenge, so the actual threat of prosecution from the Commission is actually not necessary. I can refer you to a variety of cases that have stated that the existence of a statute is actually enough. And as long as there is a reasonable belief that a discipline in this circumstance could take place because of speech, that is adequate. A specific disciplinary proceeding does not have to actually take place. So what is the threat here? The threat here is that if judicial candidates answer the questionnaire and announce their views, then they will be charged with violating the canons of judicial conduct, specifically the Pledges and Promises Clause and the Commit Clause, and be subject to discipline for stating their views. In light of that, they have chosen not to respond, so as not to expose themselves to that discipline. Well, don't we have to have something more than that? Looking at the Getman decision, where we required a concrete plan to violate, that is, you've got a willing speaker, then there has to be specific warnings, and then there's got to be some history of past prosecution or enforcement. Where do we find that in your case? I think if you also, I might refer you to the letter that the commission sent to Alaska Rights of Life, on page 28 of the agency's record. Now, that wasn't the commission, was it? Did the commission act as a commission on that letter? You're talking about the executive director's letter? Yes. Okay. You made the statement that was the commission's letter, but I didn't find anything in the record the commission acted and authorized the letter. Not officially, Your Honor, but the letter is from the executive director of the commission who is acting as an agent of the commission. Acting as what? As an agent of the commission, and expressed the state that in her letter. And so what do we assume from that? The commission has told her to write this letter? I wouldn't make that assumption, but I think we could reasonably infer from that that she's acting with the force of the commission and that those who receive advice from her can reasonably rely on her recommendations as the voice of the commission. And then she says, well, there's likely to be a problem because you might have to recuse yourself later. Yes, and as well as express her concerns about responding to the questionnaire because it might also reflect prejudging issues as well. Now, your lead case of chilling is Laird. What are the facts of Laird? I actually do not have that case before me. Well, I'd be interested in something that was analogous to this case or even close to it where somebody not speaking amounted to enough to get a constitutional standing than somebody else. And I apologize, but I do not have that before me. I do have it. Now, the questionnaire was not distributed before the 2004 election. That is correct. The Alaska Right to Life had submitted it in 2002, received the responses that you see here in the excerpt to the record, and then in the subsequent election, 2004, after re-assessing the responses from 2002, determined that it would not send out the questionnaire because it did not see that there would be any point in doing so since the commission was recommending it. None of these judges were on the ballot in 2004. Is that correct? That is true. That is true. And the one who was most positive about what he wanted to do is the guy in it. Is that correct? I believe that is correct. But I don't think that the fact that they were not on the ballot in 2004 undermines their value to this case in terms of establishing a willing speaker Well, if you had sent out the letter to another group of judges, they might well have responded. We don't know. I suppose that is possible, although I would, you know, obviously you don't know the exact outcome of that, but I would argue that it seems unlikely, again, in light of what Marlon Princeton, I apologize, Ed is Marlon Princeton, had advocated or had told them in 2002, I don't imagine that she would have changed her position. There is no evidence of the commission coming out with any sort of statement contravening this position that was taken in 2002. You know, when you get to prudential ripeness, the commentary to the canon suggests that it should be interpreted to avoid any constitutional infirmities. What do we do with that? I think that while the commentary does advocate that, and I think that is a logical goal and the correct position to take, the fact remains that the commission has told judicial candidates that they cannot announce their views, and as a result has resulted in the jury to... Well, the commission hasn't adopted a policy. There has been no formal vote of the commission. That is correct. The person here who is the executive director has raised some questions. Yes, and that is absolutely true, although, again, as I've indicated, she acts as an agent of the commission, and from the perspective of a judicial candidate has the same authority in terms of them determining whether or not to conduct themselves one way or another as a statement from the whole commission. Let me ask you this. Even if we were to agree with you that there were standing and rightness and all the other justiciability issues were resolved, why would we want to decide the merits of this case? Why wouldn't we send it to the Alaska Supreme Court and let them decide it? I don't think that certifying the questions of the Alaska Supreme Court is necessary because we do have a statement here from the commission or at least an agent of the commission indicating the position that Alaska has taken on it. Doesn't the Alaska Supreme Court have the last word on the meaning of the canons or the rules? Yes, they do. That is true. However, in the interim, we do have circumstances where we do have plaintiffs that have been injured because of the conduct of the commission or the agent of the commission. And so certifying the question would actually not save time or it would not save resources or energy. And again, I'm taking ideas far from Raymond Buddy's We Shine, which is a United States Supreme Court case, because the case is already currently before this court to be briefed. And there is the language of the provision is fairly straightforward enough and as was indicated in Buckley in the Seventh Circuit decision, this court can try to construe provision with a right towards constitutionality so they can tackle the issue. And even if we were to impose, you know, write in some or attempt to say impose some limiting restriction on it, what we say about an issue of Alaska law is not binding on the Alaska courts. That is true. But if your construction of the provision helps you, assists you in determining whether something is constitutional or not, whether or not it's binding on the Alaska Supreme Court is of no moment, because if you determined that there was no saving construction that was available, you would rule it would be unconstitutional in which case the provision or the canon would no longer be valid. The first thing you would call it was constitutional. You know, you've made a good answer, but frankly, I have grave doubt that we're ever going to reach anything except standing. But if we did reach the merits, isn't this quite different from white? This involves judges who are in office. It doesn't, just as Kennedy's concurrence in white, say it's different. If you're an actual judge, you don't go around proclaiming your views or making promises or anything of the sort. In that way, you know, white is five to four. They just go the other way. Well, I think that it is true that judges should not go around pledging or promising certain results in a particular case, but they do announce their views regularly when they draft them. On a case. They never do it in the A.N. I mean, I'm astounded that your organization is taking this position, that they should. Well, the way the system is set up, as the opposing counsel has indicated, we do have an election here. Well, but they're not candidates for office. They're judges, and your question is, shall they be retained? Correct. That is correct. So they're being asked to speak as judges. It's very different from candidates. Well, but they also do have to, in a sense, assume the hat of a judicial candidate. You have to what? They do have to assume that or adopt or wear the hat of a judicial candidate for purposes of the election. Well, I guess I do, but it depends which hat owns larger. But as somebody who has taught judicial ethics, I'm just astonished that there should be any question as to what's proper for judges to do. Well, I would highlight to you that state judges, in contrast to federal judges, do also have a role in making law, as well as, you know, starting, as I said, Well, it doesn't make any difference. It's just the idea of a sitting judge proclaiming his views on an important issue. It's repellent to me. Well, but the question to me, the question of whether or not a judicial judge should do that is not the question that's before this court. The question before this court is whether or not the First Amendment allows and, indeed, protects a judge or judicial candidate, if they should so choose to make such a decision. Well, I'm just telling you, we'll never get to the merits. We're going to dismiss it on something else. But I'm just telling you, abstractly, as advice, it's really a serious affront to make this kind of – I look at it as an attack on the judiciary, on what is necessary impartiality in a judge. But we won't reach it. Let me turn to another question, if I could, please. I want to go back to the willing speaker. Which one of these judges would you say comes close to showing that he or she is a willing speaker? I would highlight for you both Judge Pengula's response. Pardon me? Judge Pengula's response, which is found on the next paragraph, page 49. Pegley? Yeah. And who else? And also Judge Carbonetti, which is found at page 40 and then also rolls over into page 41. Well, is it Pegley? I believe it's Pengula. Okay. He's now retired. Okay. Then what about Judge Kavor? Is that one you're relying on? Isn't this the one that declined because of advice of the commission or something? ER 58. We do rely on that also as evidence for a willing speaker. I believe all of these questionnaires, in fact, I would argue do evidence that. In terms of the strongest evidence of that. She says on advice of the commission she's going to decline. But does that show that she's willing or not willing to affirmatively indicate or willingness to speak? She says why she's not going to, but she doesn't say, but for that I would give you my view. I'm having a problem with a willing speaker issue, as you might tell, might be able to tell. And it's very difficult from this record to see where that willing speaker, which to me is a linchpin of your standing and rightness issue, is met. So why don't you tell me how you solve that problem? Well, I would assert that the standard that is required for a willing speaker is just evidencing that they have been chilled. And I don't know that it has to be a conclusive I would have answered this questionnaire but for these canons. Because a lot of times chilling is just evidence of a deterrent factor. And people can be deterred from doing something even before they actually make a conclusion. We usually require concrete evidence for constitutional standing. So you would be in a position to go to the chilling doctrine. Is that right? That somehow what's happening is going to chill these people from making statements? I would say that what has happened is that these judicial candidates have been chilled from making statements. And by what evidence in the record would you say that's true? Well, the questionnaire itself, you'll notice that the responses that we receive from judicial candidates indicate that they decline to answer. And the reason they decline to answer is noted at the bottom of the questionnaire. It says that under reasonable construction of applicable canons of judicial conduct and because I might have to recuse subsequently, I must decline to respond to this particular question. Now, I don't know that it has to be the only reason that they would decline. But that is the reason that they chose to give and why they're declining to answer. Yeah, but to have constitutional standing, it has to be that the reason. If that wasn't there, I would. I would be a willing speaker. And that would return us again to Judge Pengilly's letter where he indicates that the only reason he hesitates to answer is because of these canons. I think that that is the strongest evidence that demonstrates that he would be willing to go ahead and announce his views by answering the questionnaire if it were not for the fact that these canons take place. Okay. Thank you. I see my time has expired. May I briefly conclude? Go ahead. As Justice Scalia, quoting Justice Marshall stated in the letter, if the state chooses to tap the energy and legitimizing power of the democratic process, it must afford the participants in that process the First Amendment rights that attach to their roles. Right to Life's questionnaire seeks to facilitate that process by only asking candidates to announce their views. Judicial candidates should not fear discipline for announcing their views and, under White, should not be disciplined for exercising their First Amendment rights when contributing to the process, should they so choose. To that end, Right to Life asks the Court to decide this case on the merits and affirm the District Court's decision finding the commits clause and the rights and promises clause unconstitutional while reversing the District Court on the refusal clause constitutionality as well as the charges. Thank you. Thank you. My name is Jerry Goudet. I'm here on behalf of Steve Van Gorder of the Bar Council of the Alaska Bar Association. Since Alaska Right to Life hasn't challenged the one issue that we're involved in, which is the award of attorney's fees to my client by the District Court, we're happy to submit it to the Court on the briefs and concede my time. That's fine. You can take whatever remaining time is left and reply to the arguments that we've just heard. Thank you, Your Honors. I guess I want to begin by saying that we're correct here to have reservations that the facts are sufficiently developed to be examined for the constitutional question that's present here. And remember the White case was decided in 2002, and it was only some months after that that Alaska Right to Life sent its survey out to the judges standing for retention in that 2002 election, and that prompted the director to send out her letter. Pretty quick for the commission to have had an opportunity to review it. Nobody asked for an advisory opinion, and the commission must act as a body rather than individually. And it doesn't authorize the director to speak on its behalf, and, in fact, its rules state that statements are not binding on the commission. And as the Court noted, the final authority is the Alaska Supreme Court, which, of course, its only statement on the subject has been one that's solicitous and mindful of the judges' First Amendment rights. How do you respond to these letters? Well, the letters, and remember they're not proximate in time to when the suit was filed. But the letters are, I mean, the judges clearly are stating reservations about answering and not clear, perhaps, about their ability to. But any one of those letters would be consistent with a basis under 3E1. In other words, not that they were prohibited from speaking out initially, but that the consequences of a statement might be that if a particular case were to come before the judge later, that it might appear reasonably to the litigants in that case that the judge had pre-decided the case, and then the judge would have to recuse himself or herself under that canon 3E1, which all of the courts who've considered the question have found to be constitutional. And the judge appropriately would want to leave the judge's ability to decide cases. I mean, that is the judge's job and work to be done. And so it is completely appropriate that the judges would be not speaking out, not because that they would be punished or sanctioned, but simply to allow the judge to do the job that the judge has to do in the case. But one of these letters seems to me cuts against your argument, based on advice from Judicial Conduct Commission in my state. That was the reason that she declined. Well, that's Judge Kavar. And that statement there really goes to, I mean, first of all, the commission did not speak. I mean, there is the judicial, the process for the Judicial Commission to speak out on an issue is through either a disciplinary proceeding, which did not occur, but through an advisory opinion. And the judge did not request when there is no advisory opinion. It may or may, that may not be. This particular judge thought that letter was advice from the commission. And what we're trying to find out if this particular judge has standing, on the standing question on this particular judge, who said based on advice from Judicial Conduct Commission in my state. Again, Your Honor, it doesn't mean that the judge would have responded absent that advice, or that the advice was that the canons prohibited the speech. The advice could have been, well, Your Honor, you have to be mindful that there might be an obligation down the road that you would have to remove yourself from a particular case if it appears in a statement that you may show that you were, you know, partial towards a particular litigant in that case. It reasonably appeared that way. I think that it's reasonable to construe that answer with, I guess, reasonable to construe that answer as not applying to canon 5A1, but rather applying to 3A1. Or also, there might have been other reasons that the judge would not want to answer. There's not a statement there that the judge would have answered, but for the existence of the canon. Your time has just about up, so you can sort of sum up your reply. The language in the Pledges of Promise response is sufficiently narrowly tailored to the proper goal of ensuring the perception and reality of impartiality. And the Court, because the elapses of 3A1 is not spoken out of this, the Court should not re-read those canons and have them be re-read. And on the basis of this sort of fictional reading of the canons, strike them on that basis. And again, Your Honor, there is no standing, so the issue shouldn't have to be re-read. Thank you very much. The matter will be submitted and will stand at recess until tomorrow.
judges: Alarcon, Berzon, Tallman